

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 30, 2017**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REDDY ICE HOLDINGS, INC.**, *et al.*, | § | **CASE NO. 12-32349-SGJ-11** |
| | § | **(Jointly Administered)** |
| Debtors. | § | **Chapter 11** |

### MEMORANDUM  OPINION AND ORDER:  (A) SETTING CONTINUED HEARING ON JULY 24, 2017 AT 2:30 P.M. TO DETERMINE A PROCESS FOR DISTRIBUTING REMAINDER OF CLASS ACTION SETTLEMENT FUND; AND (B) IDENTIFYING DISTRIBUTION OPTIONS THAT SHOULD BE ADDRESSED BY PLAINTIFFS' CLASS COUNSEL[1] PRIOR TO THE CONTINUED HEARING

## I.     INTRODUCTION: THE CLASS ACTION SETTLEMENT FUND THAT WAS NEVER DISBURSED.

The above-referenced companies (collectively, "Reddy Ice" or the "Reorganized

Debtor"), which were, or are, among the country's largest manufacturers and sellers of packaged

---

[1] Other parties-in-interest are welcome to provide comment, if they so choose.

ice, filed a voluntary Chapter 11 bankruptcy case on April 12, 2012. Reddy Ice was highly successful in swiftly obtaining confirmation of a prepackaged reorganization plan on May 22, 2012. The bankruptcy case was administratively closed on September 30, 2013. Now, many years later, counsel purportedly acting for the so-called "***Indirect Purchaser Class Plaintiffs***" (later described) has moved to reopen the bankruptcy case, for the sole purpose of asking this bankruptcy court to approve an "allocation plan, advertisement and claims process" so that counsel for these class plaintiffs may at long-last distribute (after payment of some additional fees and expenses) what is left of a certain class action settlement fund that this court approved, and that was paid by Reddy Ice to counsel for the plaintiffs, ***in May 2012***.

To be clear, ***this court approved a class action settlement, pursuant to Fed. R. Civ. Proc. 23 (as applicable in bankruptcy, pursuant to Fed. R. Bankr. Proc. 7023), early during the Reddy Ice Chapter 11 case***, and counsel for the plaintiffs (after paying its court-approved legal fees and expenses), has never even notified the plaintiffs of a claims submission process—much less disbursed any of the settlement funds to any of the claimants—*i.e.*, claimants that plaintiffs' counsel was charged to "adequately represent," pursuant to Fed. R. Civ. Proc. 23(g). The five-year delay here (which is hard to truly comprehend) is disturbing. But the economics here—and the likely futility of reliably ascertaining a class of claimants to whom to distribute funds, after all this time—are equally disturbing. The settlement fund at issue here was **$700,000**. Of that $700,000 fund, **$406,584.67** has been expended on professional fees and expenses, leaving **$297,502.54**. The costs now projected by plaintiffs' counsel for advertising and setting up a claims process is estimated in its pleadings to be another **$179,812**, which would leave **$117,690** to disburse to the class plaintiffs. ***And who are these thus-far-absent, unidentified class plaintiffs?*** Well, thankfully, they are not individuals or estates of individuals

who were maimed or killed.  The class plaintiffs are essentially defined as ***consumers who bought a package of ice anywhere in the continental United States, which was manufactured by either Reddy Ice or one of two other big ice manufacturers, between nine and sixteen years ago (i.e., during the years 2001-2008)***.  Does this sound like a class consisting of me, you and every other freedom-loving American?  It seems that the theory of the putative class action (that Reddy Ice and plaintiffs' counsel apparently felt compelled to quickly agree should be certified then settled—and which this court felt compelled to approve, absent objections) was that the big three sellers of packaged ice in America engaged in anti-competitive conduct during the years ***2001-2008*** and, thus, consumers presumably paid too much for bags of ice.  And plaintiffs' counsel has all but assured the court that the actual claimants (whomever they are and wherever they are—and whenever and however finally noticed) are likely to receive no more than a peppercorn once the remaining settlement funds are disbursed.  The court is not naïve—the court knows that this is the reality of many class action settlements (particularly where consumer products are involved); there is often not a meaningful recovery.  And this court well understands that class actions like this sometimes serve a laudable purpose of deterring questionable business practices.  But the situation here (the delay; the obstacles to a reliable and feasible method for disbursing funds that should have been obvious from "Day One") is most disturbing.  This court was told long ago—in motions and hearings—that the settlement fund at issue would be combined with a similar settlement fund that had been obtained from another ice manufacturer in a class action pending in the United States District Court for the Eastern District of Michigan and disbursed under the supervision of ***that*** court (apparently, this was expected to yield a more meaningful distribution—through a joint claims administration process).  That did not come to fruition.

In any event, this court determined, at a hearing a few weeks ago, that it was necessary to reopen the Reddy Ice bankruptcy case so that the settlement it long-ago approved can finally be somehow implemented. The options for disbursement of the settlement fund, at this point (so many years after any alleged harm), are all imperfect—to say the least.

## II.     THE MOTION NOW BEFORE THE COURT.

Before the court now is a motion entitled: *Indirect Purchaser Class' Revised Motion To Reopen Case, For Approval Of An Allocation Plan, Advertisement And Claims Process And Authorization To Pay Expenses Associated With The Same And Distribution To Claimants* (the "Motion for Claims Process") [DE # 796]. The Motion for Claims Process seeks, primarily, approval of: (i) a strategy (*i.e.,* claims process) to at long last pay out the previously approved Reddy Ice Qualified Settlement Fund ("QSF"), (ii) an advertisement to solicit claims for the QSF, (iii) authorization to pay for the costs of the advertisement and claims process, and (iv) distribution of the QSF.

## III.    SUMMARY OF THE INDIRECT PURCHASER CLASS LITIGATION.

As alluded to earlier, the "Indirect Purchaser Class Litigation" was based upon an alleged conspiracy between three big manufacturers and sellers of packaged ice: Reddy Ice, the Home City Ice Company ("Home City") and the Arctic Glacier group of companies ("Arctic Glacier").[2] The theory asserted was that, between at least the years 2001-2008, these companies conspired to carve the United States into three territories (one for each of the companies) and not compete. This presumably might have caused the price of a package of ice to be artificially inflated for consumers. The named plaintiffs in the various law suits were basically described as consumers who purchased ice manufactured by any of the big three ice companies at retail establishments

---

[2] A Canadian entity with a U.S. subsidiary.

4

throughout the continental United States and District of Columbia between 2001 and 2008 (the "Indirect Purchaser Plaintiffs" or the "Plaintiffs").  Plaintiffs' counsel is the Wild Law Group PLLC ("Plaintiffs' Counsel" or the "Wild Law Group").  The Plaintiffs alleged claims under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, for injunctive relief, and claims for damages under the laws of 17 or 18 states.[3]  It seems that the United States Supreme Court, in the case of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), held that indirect purchasers ***may not recover monetary damages*** for violations of the federal antitrust laws.  However, since 1977, according to Plaintiffs' Counsel, various states have enacted legislation that authorizes recovery of damages for indirect purchasers or have interpreted their pre-existing statutes to authorize monetary damages.  Note that there were also "***Direct*** Purchaser Class Actions" (in which the plaintiffs were ***retail*** establishments that ***directly*** purchased packaged ice—as opposed to the ***indirect*** consumers, the latter of which the companies would have no records of sales).[4]   In any event, more than 70 different actions against the three big ice companies, based on this theory of anti-competitive conduct, were filed in various districts around the country, starting in the year 2008 (likely spawned, in large measure, by a 2008 investigation by the Department of Justice into the packaged ice industry[5]) and eventually all such actions were transferred to the District

---

[3] The court understands such states to be Arkansas, Michigan, North Carolina, Minnesota, New York, Wisconsin, California, Tennessee, Nevada, Maine, Arizona, New Mexico, Iowa, Nebraska, Massachusetts, Kansas, and Mississippi.  *See* DE # 164, ¶ 13.  *See also* DE # 271, ¶ 3 and n.2.  The state of Florida may also be one of those states.  *See* DE # 164, Exh. B, ¶ 12.  Apparently, the state statutes are either state antitrust acts or consumer protection and deceptive trade practices acts.

[4] The Direct Purchaser Class Action Litigation is not relevant in any way to the current matters before this court.

[5] With regard to this Department of Justice investigation, the court understands that, while certain Arctic Glacier and Home City employees pleaded guilty to certain charges brought by the Department of Justice's investigation of those entities (such charges involving a conspiracy in southeast Michigan), the Department of Justice eventually closed its investigation into Reddy Ice and took no action against Reddy Ice or its employees.  *See* DE # 164, ¶¶ 24- 33.

Court for the Eastern District of Michigan ("District Court-E.D. Mich.") by the Judicial Panel on Multidistrict Litigation where they were consolidated for pretrial purposes.[6] The District Court-E.D. Mich. apparently denied (at least in part) various motions to dismiss of the defendants of both types of actions (Indirect Purchaser and Direct Purchaser) in the years 2010 and 2011. In December 2011, the District Court-E.D. Mich. authorized the commencement of discovery relevant to class certification. Then, in February 2012, one of the defendants, Arctic Glacier, filed for bankruptcy protection in Canada and the United States Bankruptcy Court for the District of Delaware. Then, on April 12, 2012, Reddy Ice filed for bankruptcy protection (with a prepackaged Chapter 11 plan). As a result of the Reddy Ice and Arctic Glacier bankruptcies, the only defendant that remained before the District Court-E.D. Mich. was Home City. To be clear, the Indirect Purchaser Class had not yet been certified as of the time Reddy Ice filed its bankruptcy case (although the litigation had been pending quite awhile).[7]

The Reddy Ice bankruptcy case moved swiftly (again, Reddy Ice filed bankruptcy with a prepackaged plan). One of the lead/named plaintiffs in the still-putative Indirect Purchaser Class Litigation, Mr. Lawrence J. Acker ("Acker"), a litigation lawyer from Detroit, Michigan, joined the Official Committee of Unsecured Creditors. Reddy Ice almost immediately thereafter (on April 30, 2012) filed an Objection to Acker's "informal" proof of claim (Acker had not yet filed a formal proof of claim in the Reddy Ice bankruptcy case, but Reddy Ice asserted that Acker's representation to the United States Trustee that he had a claim against Reddy Ice constituted an informal proof of claim to which it could object).[8] The objection was aimed primarily at both the

---

[6] *See In re Packaged Ice Antitrust Litig.*, Case No. 2:08-MD-1952-PDB.

[7] The court notes that two days before Reddy Ice filed bankruptcy, the Indirect Purchaser Class Plaintiffs filed an action in the United States District Court of the Central District of California against various ***officers and directors*** of Reddy Ice making the same type of antitrust allegations against them personally.

[8] *See* DE # 164.

alleged lack of any evidence of a conspiracy as well as the speculative nature of the purported damages of Acker and other putative class members he sought to represent. Soon thereafter, a $700,000 settlement (the "Indirect Purchaser Class Settlement" or the "Settlement") was proposed by Reddy Ice to the Indirect Purchaser Plaintiffs and supported by Plaintiffs' Counsel and the 19 individuals who were named/lead plaintiffs in the District Court-E.D. Mich. Indirect Purchaser Class Litigation. And, on May 7, 2012, Acker and the so-called Indirect Purchaser Class Plaintiffs filed a Motion for Class Certification for Settlement Purposes (the "Rule 23 Motion") in the bankruptcy court.[9]

The Rule 23 Motion requested that the bankruptcy court: (a) incorporate Fed. R. Bankr. Proc. 7023 (and thereby Fed. R. Civ. Proc. 23) into the Acker claim objection contested matter and the overall Reddy Ice bankruptcy case, so that the Indirect Purchaser Class Plaintiffs could proceed forward as a Rule 23 class, to attempt to secure the Settlement proposed by Reddy Ice; (b) certify the putative class of Indirect Purchasers for settlement purposes;[10] (c) preliminarily approve the $700,000 Settlement as fair, reasonable, and adequate pursuant to Rule 23(e)(2); (d) approve a form of notice to the class, pursuant to Rule 23(e)(1) (*i.e.,* an advertisement in *USA Today*, a website, and an 800 toll-free phone number, to provide relevant pleadings and information on how to object to the Settlement at the final approval hearing); (e) set a final fairness hearing, for possible final approval of the $700,000 Settlement and to consider any Class member objections; (f) approve the Wild Law Group as lead counsel (the Wild Law Group had previously been named as ***interim*** lead counsel in the District Court-E.D. Mich.); and (g)

---

[9] *See* DE # 271.

[10] Recall that the class had never actually been certified in the District Court-E.D. Mich. However, the so-called Direct Purchaser Plaintiffs' class had been certified pursuant to Rule 23 by the District Court-E.D. Mich. and that fact (and the similarities in that litigation) was heartily argued as a justification for the bankruptcy court granting class certification to the Indirect Purchaser Plaintiffs.

designate the named plaintiffs, including Acker, as class representatives.[11]  The Rule 23 Motion did not request any approval of a distribution procedure.  It requested the bankruptcy court retain jurisdiction to approve a distribution process in the future.  The court approved the Rule 23 Motion at a hearing on May 11, 2012 (essentially "Step 1" of the two-step process required for a settlement, pursuant to Rule 23).  Among other things, the court approved, pursuant to the Rule 23 Motion, a form of Rule 23(e)(a) publication notice which stated:  "There is no claims process or money available at this time.  You can register online to be notified if a claims process or money is available to pay claims at a later date."[12]  The long-form notice that was to be published on Plaintiffs' Counsel's website stated:  "[T]here is no claims process available at this time.  Reddy Ice's contribution to the Settlement Fund may be combined with money from any future settlements with other Defendants or used to pay Class Counsel's attorney's fees or expenses.  There may be a claims process at a later time.  Disbursements from the fund will be approved by a Federal Court (either a U.S. District Court or a U.S. Bankruptcy Court).  . . . You may register at www.icesettlements.com to be notified if there is a claims process in the future."[13]

On May 18, 2012, in conjunction with the approval of a plan of reorganization for Reddy Ice, the court held the ultimate final "fairness" hearing, under Rule 23, regarding the proposed Indirect Purchaser Class Settlement.  There were no objections.  Among the various representations that were made to the bankruptcy court were that the Indirect Purchaser Class

---

[11] Simultaneously with the filing of the Rule 23 Motion, Reddy Ice filed a traditional Bankruptcy Rule 9019(a) Motion for Approval of Settlement with the Indirect Purchaser Class Action Plaintiffs (the "Rule 9019 Motion") to separately have the bankruptcy court consider whether the settlement was fair and equitable, within the range of reasonableness, and in the best interest of creditors of the Reddy Ice bankruptcy estate.

[12] *See* DE # 271, Appendix 1.

[13] *Id.*

Plaintiffs' alleged claims were potentially worth more than $400,000,000.[14]  Moreover, under the

Reddy Ice proposed prepackaged plan of reorganization, a fund of $300,000 (Class 8B) had been

set aside for all general unsecured claimants of Reddy Ice Holdings, Inc. (that would, absent the

Settlement, have been inclusive of any allowed claims of the Indirect Purchaser Plaintiffs).  With

the Settlement, the $300,000 fund for general unsecured creditors of Reddy Ice would not be

diluted by the claims of the Indirect Purchaser Plaintiffs.  The bankruptcy court approved the

Settlement, pursuant to Rule 23, and designated the $700,000 Settlement fund as a Qualified

Settlement Fund (the "QSF") under the Internal Revenue Code § 468B and Treasury Regulations

promulgated thereunder.  The bankruptcy court retained exclusive jurisdiction over the QSF for

eventual distribution after payment of attorneys' fees and expenses.[15]  The Settlement fund, at

least initially, would be held in escrow by Plaintiffs' Counsel, the Wild Law Group.  To be clear,

as early as May 18, 2012, it was envisioned that the Reddy Ice Settlement Fund might be

combined with settlements that were expected to be received from Home City and maybe Arctic

Glacier, too (for a combined claims process, that would supposedly save advertising and noticing

expenses, be more efficient, and would maximize distributions for all potential Indirect

Purchaser claimants) but, again, a distribution process would be defined and subject to court

approval at a later time.[16]

On August 30, 2012, the bankruptcy court considered the fee application filed by the

Wild Law Group as Class Counsel for the Indirect Purchaser Class, in which Class Counsel

sought a one-third contingency fee as to the gross amount of the $700,000 Settlement

---

[14] *See* DE # 271, ¶ 31.

[15] *See* DE # 422.

[16] *Id.* at ¶¶ 3 & 5.

($233,333.33). It also sought: (a) reimbursement of fees and expenses for various local bankruptcy counsel it had to retain (totaling $80,485.34); (b) modest compensation to the Class representatives, including $2,000 for Acker and $200 each for the other Class representatives; and (c) consulting fees to Rust Consulting in the amount of $30,866.71 (plus authority to pay ongoing fees to Rust) for maintaining a website, toll-free phone number, and post office box established for Indirect Purchaser claimants. The bankruptcy court approved these fees and expenses. Among other things, the Wild Law Group represented that it has devoted more than 4,000 hours relating to the Indirect Purchaser Litigation over the more than three years it had worked on it and that the one-third contingency was far less than what a lodestar analysis might yield.

Nothing relevant to this matter happened for many months. Then, the Reddy Ice bankruptcy case was closed eventually on September 30, 2013. As the saying goes, "Out of sight; out of mind."

Then, unexpectedly on January 29, 2016, the Indirect Purchaser Class Plaintiffs moved to reopen the Reddy Ice bankruptcy case so that this court could consider their motion for approval of a process to finally distribute what was left of the $700,000 Settlement (at this point, $386,309.89 of the Settlement funds had been paid out for fees and expenses, leaving **$316,734.98**).[17] The motion that the Indirect Purchaser Class Plaintiffs filed in January 2016 indicated that their counsel, the Wild Law Group, had recently negotiated a $2.7 million settlement against Home City in the class action suit still pending against Home City in the District Court-E.D. Mich., and that the Wild Law Group sought to combine the two settlement funds into a single claims and distribution process (which made sense, from an expense and

---

[17] *See* DE # 782.

efficiency standpoint, since there was significant overlap in the potential claimants against Home City and the potential claimants of Reddy Ice).[18] The Wild Law Group represented that the District Court-E.D. Mich. had suggested this combined process "makes the most sense" and that District Court-E.D. Mich. would oversee the distribution process.[19] In summary, the Wild Law Group requested permission from this bankruptcy court to terminate the Reddy Ice settlement website, call center, and post office box and permit the Wild Law Group to "combine the [Reddy Ice Settlement] with the settlement fund created by the Home City Settlement after the Home City Settlement receives final approval . . . with the combined fund allocated pursuant to a plan approved by the District Court."[20] The Wild Law Group also requested approval of some additional fees and expenses for itself and Rust Consulting related to: (a) having to bring this newest motion, (b) terminating the Reddy Ice website, and (c) some related activity. While the bankruptcy court was rather flabbergasted and frustrated that the Reddy Ice Settlement funds (what was left of them) had never been disbursed to the Reddy Ice Indirect Purchaser Plaintiffs (whomever and wherever they were by now), the court approved the motion of the Wild Law Group—at least being content that matters were finally going to be handled, under the watchful supervision of a District Judge in the Eastern District of Michigan, in a combined process with the larger Home City fund, that might yield a more efficient and meaningful recovery for any

---

[18] Apparently, the Wild Law Group's desire to also combine settlement proceeds from the Arctic Glacier bankruptcy had fallen by the way side—because of alleged "intricacies and unknowns of the bankruptcy laws of Canada"—so Arctic Glacier was not proposed to be included in this combined claims process. *See* DE # 796, ¶ 3. The Wild Law Group has represented to this court that settlement funds realized from the Arctic Glacier bankruptcy case for the Indirect Purchasers Plaintiffs have already been fully disbursed pursuant to a separate claims process.

[19] *See* DE # 782, ¶¶ 8-9.

[20] *Id.* at p. 7.

genuine claimants. The bankruptcy court signed an order on March 23, 2016, and re-closed the Reddy Ice bankruptcy case.

Fast forward to the present. To this court's utter shock and dismay, on February 3, 2017, the Wild Law Group moved to reopen the Reddy Ice bankruptcy case again. It seems that the Wild Law Group somehow misread or misunderstood the District Judge in the District Court-E.D. Mich. In mid-2016, the District Court-E.D. Mich. ruled that the Reddy Ice Settlement fund should not be combined with the Home City settlement fund. Thus, now—approximately *five years* after Reddy Ice's prepackaged bankruptcy plan was approved, and *between nine and sixteen years after any alleged harm to consumers from purchasing allegedly overpriced packaged ice* —we are at "Square 1" as far as determining a claims allowance and distribution process to Indirect Purchaser Plaintiffs.

## IV. THE PROPOSED PROCESS FOR WHICH THE WILD LAW GROUP SEEKS APPROVAL.

The Motion for Claims Process that is now before the bankruptcy court[21] seeks, primarily, approval of: (i) a strategy to at long last pay out what is left of the previously approved Reddy Ice Settlement ($406,584.67 of the Settlement Fund is now expended; only **$297,753.03** is left[22]), (ii) an advertisement to solicit claims for the Settlement fund, (iii) authorization to pay for the costs of the advertisement and claims process, and (iv) distribution of the Settlement Fund. An Exhibit 5 attached to the Motion for Claims Process estimates **$179,812** might be the remaining costs associated with the proposed process (inclusive of a $20,805 advertisement in

---

[21] The court refers to the amended motion filed April 17, 2017 [DE # 796] which changed certain requests originally made in February 2017.

[22] The court earlier ordered the Wild Law Group to wire all remaining Settlement Funds into the Registry of the Bankruptcy Court, which it did a few weeks ago.

*USA Today* and expenses of claims administrator Rust Consulting—who, among other things, would: (a) create an online claims filing module, (b) mail claim forms to anyone who asks for a hard copy of the claim form, (c) ultimately process claims, and (d) send checks).  This would leave **$117,690** to distribute to potential claimants.  The Wild Law Group has estimated that maybe **95,000** claims would be filed.  ***This would result in a recovery of $1.24 per claimant***.  The court is confounded how this 95,000 estimate can possibly be derived,[23] considering the class consists of essentially any person ***who bought a package of ice anywhere in the continental United States, which was manufactured by either Reddy Ice or one of the two other big ice manufacturers, between nine and sixteen years ago (i.e., during the years 2001- 2008)***.  In any event, the Wild Law Group proposes that any undistributed funds[24] be distributed *cy pres,* for the indirect benefit of the Reddy Ice class, to some charitable organization that might be a large user of ice (like "Feeding America" or the American National Red Cross, Inc.).

As far as the claims submission process is concerned, it is proposed that any person who makes a claim is simply required to "verify under oath" that he or she bought a bag of ice during the 2001-2008 time frame by clicking an on-line box or by checking a box on a hard copy form, but ***no proof of purchase is required, since it is assumed that few people would have a receipt for a bag of ice after so long***.  Only in the event that a person claims to have purchased more than six bags of ice, is he or she required to produce a receipt.  To promote the integrity of the process, it is proposed that only one claim be allowed per household.  A claims filing deadline of 90 days is proposed.

---

[23] Presumably, the number is loosely derived from experience with Arctic Glacier and Home City, but it is not clear from the pleadings.

[24] Such as if there are uncashed checks or if the number of eligible claimants exceeds the amount available for distribution.

## V.      CONCERNS OF THE COURT AND ISSUES/OPTIONS TO BE ADDRESSED.

*Why are we here and why are we doing this?*

In all seriousness, reasonable minds cannot help but wonder why so much effort and delay has been incurred for so little?  Plaintiffs' Counsel and its consultants and other professionals have been paid handsomely, thanks to Reddy Ice's business decision to write a big check for its alleged wrongdoing that was never proved.  Reddy Ice, no doubt, felt compelled to avoid a nuisance[25] and settle the Indirect Purchaser Class Litigation to avoid delay and expense that might otherwise have derailed its carefully structured and negotiated prepackaged bankruptcy case.  No one objected to the Settlement and this court acquiesced.  As earlier alluded to, maybe this is all "okay."  Maybe this Settlement served the laudable purpose of deterring Reddy Ice and others similarly situated from committing questionable anticompetitive business practices.  But this court, looking backwards, wonders if a class like this should have ever been certified to begin with if:  (a) it is so unlikely that class members can produce proof (receipts) of purchase some nine-to-sixteen years after the fact; and (b) it is so unlikely that any class member will realize any meaningful benefit.  Perhaps the settlement was premised on a "faux" or bad class certification—perhaps we all should have recognized from the very beginning that there was never any reliable or feasible method of distributing recovery.[26]

In recent years, a large number of federal courts have constructed an "implicit" requirement for class certification, in addition to the explicit requirements established in Rule 23

---

[25] The court uses the term "nuisance"—with foremost in its mind the fact that the United States Supreme Court has ruled that indirect purchasers may not recover monetary damages for violations of the federal antitrust laws and only some states have state statutes or precedent that authorizes recovery of monetary damages for indirect purchasers.  *See Ill. Brick Co. v. Illinois,* 431 U.S. 720 (1977).

[26] *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011) (courts should undertake a "rigorous analysis" at the beginning of any putative class action to ensure that a proposed class meets the Rule 23 requirements).

of the Federal Rules of Civil Procedure:[27] the "***ascertainability requirement***" (at least in the context where damages—as opposed to mere injunctive relief—are sought). Specifically, "ascertainability" is sometimes viewed as an implicit requirement for class certification at the very outset of an action.[28] The idea, essentially, is that there ought to be an ***objective*** and ***administratively feasible*** way to determine exactly whom would be in a proposed class. Judge Ambro wrote in the opinion *Marcus v. BMW of North America, LLC,* that the ascertainability requirement "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action"—namely the critical task of paying the plaintiffs in the event that they prevail."[29] These sentiments were echoed by the majority in *Carrera v. Bayer Corporation*: "a trial court should ensure that class members can be identified without the extensive and individualized fact-finding or 'mini-trials,' a determination which must be made at the class certification stage."[30] The ascertainability requirement has most often been adopted in the situation of consumer class actions.[31] It avoids problems of vague or subjective classes. The

---

[27] Rule 23's explicit requirements are: (1) that a proposed class would have so many members that joinder of each individual plaintiff would be "impracticable"; (2) there are common questions of law or fact with regard to the proposed class; (3) the proposed representative plaintiffs have claims that are typical of the proposed class; and (4) the proposed representative parties will "fairly and adequately" represent the absent class members. If these four requirements are met, the proposed class must additionally fit into one of three categories: (a) individual suits would result in inconsistent legal obligations being imposed on the defendant or might result in the plaintiffs who sue first being the only ones compensated; (b) injunctive relief is appropriate respecting the class as a whole; or (c) if class issues predominate over individual issues and a class action is superior to other avenues of resolution.

[28] *See* G. Shaw, *Class Ascertainability*, 124 YALE L.J. 2354, 2357, n.14 (May 2015).

[29] *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012) (Third Circuit decertified lower court's certification and remanded for further proceedings, in class action involving so-called run-flat tires that plaintiffs argued were defective and falsely advertised by Bridgestone and BMW; Third Circuit expressed concerns regarding identifying with reliability whom would be members of the class).

[30] *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (drug company Bayer was sued regarding allegedly misleading advertisements of One-A-Day Weight Smart Vitamins by putative class of plaintiffs who allegedly purchased the vitamins; Third Circuit rejected the notion that class members without receipts could be ascertained based on say-so affidavits, citing concerns that affidavits of class members could dilute recovery of true class members, as well as manufacturer's interest in ensuring it paid only legitimate claims ).

[31] *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004).

case of *DeBremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970), has been described as an "early precursor" to the ascertainability doctrine (court refused to certify a class of residents of a state who were active in the "peace movement" because of the uncertainty of the meaning of "peace movement").[32]

In the case of ice-buying consumers, it would seem that purchasing a bag of ice is an objective fact; on the other hand, if the only proof required to receive a distribution is a "say-so" act of checking a box, with no receipt or other documentary evidence required, then there is too much subjectivity (not to mention, less integrity than we normally require in the universe of bankruptcy claims-allowance). In the case of ice-buying consumers, some may have purchased their ice in states where monetary damages are not permitted by any state statute for indirect purchasers, and others in states with no such prohibition. Also, some ice-buying consumers may have paid a perfectly reasonable price for their ice (for example, sometimes Walmart and convenience stores may sell ice at discounted prices, as a "loss leader," to bring people into their stores to hopefully buy more and different products). On the other hand, maybe other consumers legitimately paid too much for ice, due to a price fixing conspiracy.

These ascertainability issues are problematic in the world of bankruptcy. Bankruptcy courts are in the business of regularly presiding over claims processes that are governed by the Bankruptcy Code and Bankruptcy Rules. The process of claims allowance in bankruptcy is designed to ensure that legitimate claims receive an appropriate share of a *res*, based upon Bankruptcy Code priorities, and do not get diluted by illegitimate claims. The statute and rules

---

[32] *See* G. Shaw, *Class Ascertainability*, 124 YALE L.J. 2354, 2381 (May 2015). *See also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23").

build in ***integrity*** (among other things, evidence in support of one's claim is required, as is a signature under penalty of perjury). The statute and rules contemplate ***promptness*** (typically, there is a bar date that falls within 90 days after the first meeting of creditors in Chapter 11—although sometimes shorter and sometimes longer). The statute and rules contemplate ***transparency*** and ***vetting***; all parties-in-interest in the bankruptcy case are permitted to see filed proofs of claim and object to them if there are any obstacles to enforceability, such as if a claim is unsupported by proof or is time-barred by a statute of limitations.

This court is struggling mightily with how there can be any integrity and legitimacy in a process here—especially so late in the game.

This court will not condone a process where no proof of harm to obtain Settlement funds is required, except for a "say-so" checking of a box. To do so would invite mischief. At a minimum, it is not consistent with the integrity normally expected in our bankruptcy system. The court is also not inclined to allow any more professional fees to be paid from the QSF.

The court sets forth the following imperfect possibilities for a claims allowance and distribution process, and instructs Plaintiffs' Counsel and any other parties-in-interest who wish to express a position to file briefs within 30 (thirty) days after the entry of this Order. The court expects the briefs to contain legal authority—not mere ideas. The court remains open to other proposals.

1. **Option #1**. Plaintiffs' Counsel will place an advertisement in *USA Today* soliciting claims from persons who might have purchased ice (from Reddy Ice, Arctic, or Home City) during 2001-2008 in one of the 18 states[33] that have been represented by Plaintiffs' Counsel to permit monetary damages to indirect purchasers. Claimants shall be required to file a proof of claim form with the Bankruptcy Clerk for the Northern District of Texas, Dallas Division, with there being a requirement that claimants include receipts as proof of purchase and sign the proof of claim form under penalty of perjury. After a deadline (60 days perhaps), the court can decide,

---

[33] The court is not clear whether there are definitely 18 states or possibly more. This is simply what was represented to the court in pleadings filed early in the Reddy Ice bankruptcy case.

based on the number of claims filed (if any), whether claims analysis and objections are warranted and who will do this. If no legitimate claims are filed (or so few are filed that there are excess funds), Options ##2 or 3 below can be considered.

2.  **Option #2.** Forego a claims process altogether at this point. Simply remit the remaining QSF funds to Reddy Ice to disburse *pro rata* to the allowed Class 8B claimants under their confirmed plan (general unsecured creditors).

3. **Option #3.** *Cy pres* disbursement. Instruct Reddy Ice to, within 30 (thirty) days, designate a charity to whom to disburse the QSF funds—a direct payment of the money in the Registry of bankruptcy court will be made to such charity.[34]

**WHEREFORE, IT IS HEREBY ORDERED** that Plaintiffs' Counsel and any other interested parties shall respond to this order and the Options set forth above with responsive legal briefing by **June 30, 2017**.

**IT IS FURTHER ORDERED** that Plaintiffs' Counsel and any other interested parties shall appear on **July 24, 2017 at 2:30 P.M.** for a continued hearing on the Motion for Claims Process, where the court expects to rule on how to disburse the QSF funds.

**###END OF MEMORANDUM OF OPINION AND ORDER###**

---

[34] With regard to this Option #3, the court notes that some courts, in situations like this, have ordered a monetary payout to a non-party, such as a charity, whose mission is related to the harm addressed in the suit. This is what is known as a *cy pres* remedy. Wilber H. Boies & Latnia Haney Keith, *Class Action Settlement Residue and Cy Pres Awards: Emerging Problems and Practical Solutions,* 21 Va. J. Soc. Pol'y & L. 267, 270 (2014). Another option sometimes utilized is the so-called "fluid recovery" option, where harmed class members are so difficult to locate with specificity that it is economically more feasible to make the class action damages available to a substitute group of similarly situated persons. William B. Rubenstein, Newberg on Class Actions § 12.27 (5th ed. 2017). Bottom line, Rule 23 permits courts to manage the process and permits alternative remedies that can be appropriate when paying damages to a class would be overly burdensome.